**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**
**CASE NO. 2:06cv1059 (WOB)**

**AKITA MILLER, ET AL.**                                                    **PLAINTIFFS**

**VS.**                                                  **ORDER**

**TODD HUSS, ET AL.**                                                    **DEFENDANTS**


This matter is before the court on the defendants' motions for summary judgment (Docs. 25 & 27), the response and replies thereto, and the supplemental briefs of the parties (Docs. 59, 60, & 61).

**FACTS**

### A.  The Paramedic Dispatch

On November 12, 2005, at approximately 12:40 p.m., plaintiff Miller arrived with her children at her sister, Thyais Blocker's, apartment.  As Miller entered the apartment, Blocker informed her that their younger sister, Imani Brown, was very ill.  After seeing her sister, Miller called her husband to come get their children and then called 911 to report Ms. Brown was suffering from severe abdominal and back pain.

Paramedic Defendants Huss and Eberly-Hoshor of the Clinton Township Fire Department responded to the 911 call.  Upon arriving at the scene, Huss and Eberly-Hoshor were met by Blocker who informed them that Brown was in need of medical attention because of stomach pain.  After entering the apartment, Huss and Eberly-Hoshor saw Brown lying on the bathroom floor.  In order to take Brown's blood pressure, Huss asked if Brown could be moved to the couch.

Miller alleges that she helped move Brown to the couch where she immediately toppled over. Miller claims that Eberly-Hoshor slammed Brown back into a sitting position and took her blood pressure. Huss claims that Brown sat back up on her own accord. Afterwards, Brown laid back down on the couch.

Huss claims that he asked Brown to sit up again so that he could finish assessing her. Miller claims that Eberly-Hoshor slammed Brown against the couch and wall two more times. Miller told Huss that she was a medical student and that she knew her sister's vital signs could be taken while lying down. Huss claims that Miller used profanity and that she was vigorous in her statements to which he replied that he "didn't care who she was . . . I'm not here to take care of you."

Miller claims that, after Huss spoke to her in a rude manner, she stated her intention to lodge a complaint and immediately left the apartment. Huss and Eberly-Hoshor allege that Miller responded by indicating that she was going to call her husband. Miller denies she threatened to call her husband. The paramedics claim that, after hearing Miller threaten to call her husband, Huss requested Eberly-Hoshor call the police and Eberly-Hoshor left the apartment to make the call. The paramedics claim that Miller and Blocker followed Eberly-Hoshor outside. Huss claims that, after the women followed Eberly-Hoshor outside, he heard screaming outside and he could not continue to care for the patient.

Miller claims that, before Eberly-Hoshor called the police, she was already outside making a complaint against Huss and Eberly-Hoshor. Miller further claims that the paramedics only decided to call the police in retaliation for her making a complaint against them. In support of this allegation, Miller notes that phone records show she placed her complaint call at 1:01,

2

while the call to the police was not received until 1:04.

Eberly-Hoshor alleges that, after he placed the call to the police, he attempted to re-enter the apartment but was followed by Miller and Blocker, who were both yelling at him.  Miller, however, contends that she did not go back into the apartment until her husband arrived and did not have any further direct conversations with either paramedic.  Shortly after Eberly-Hoshor re-entered the apartment, Miller's husband Abbey entered the apartment.  After Abbey entered, both defendants left the apartment and waited outside for the police.

**B.  The Arrival of the Police.**

Within a few minutes of Huss and Eberly-Hoshor exiting the apartment, Columbus Police Officer Ronald Lemmon arrived at the scene.  The paramedics informed Officer Lemmon that Miller and Blocker were interfering with their treatment of Brown by yelling, interjecting when they asked Brown a question, Miller's telling them her husband was on his way, their following Eberly-Hoshor outside when he called the police, and Blocker's attempt to stop Eberly-Hoshor from re-entering the apartment.

Officer Lemmon testified that while he was talking to the paramedics he could see Blocker, Miller and Abbey standing outside the apartment building.  Officer Lemmon began to escort Huss and Eberly-Hoshor back towards the apartment to treat Brown but, as they neared the apartment, Blocker got in front of him and asked him "where do you think you are going?"

During Lemmon's confrontation with Blocker, Officer Bell arrived at the scene.  As Lemmon proceeded to arrest Blocker, he told Bell to arrest Miller based upon what the paramedics had told him had occurred previously.   Bell claimed that, as she grabbed Miller's arm to place her under arrest, Miller pulled away and that Abbey grabbed Bell's arm in an

3

attempt to prevent Miller's arrest.  Miller and Abbey claim that Abbey grabbed Miller's arm, not

Bell's arm, to prevent her arrest.

### C.  The Arrival of the Firefighter Wright

Firefighter Jeff Wright, who was responding to Eberly-Hoshor's call for assistance, saw

Abbey run toward Bell and grab Bell's arm while Bell was attempting to arrest Miller.  In

response, Wright grabbed Abbey and pulled both of his arms behind his back.  Wright admits

that he restrained Abbey from behind and placed him face down on the police cruiser until

Lemmon placed Abbey under arrest.  Prior to restraining Abbey, Wright did not have any

interaction with anyone at the scene and no one requested his assistance in restraining Abbey.

Moreover, Wright admits that he had no arrest authority, and that he did not act pursuant to an

official Clinton Township policy, rule or regulation.  At Abbey's trial, Wright stated that "[he]

thought it was [his] job to help protect and assist the officer."

### D.  State Criminal Proceedings and Filing of Civil Action

Miller was charged with "misconduct at an emergency" and "resisting arrest."  *See State

v. Akita Miller*, 2005 CR B 0285560.  Abbey was charged with "resisting arrest" as a result of

his attempt to prevent Miller's arrest.  *See City of Columbus v. Elias Abbey*, 2005 CR B 02856.

Miller was found not guilty at the criminal trial, and the charges against Abbey were dismissed.

On November 13, 2006, the plaintiffs filed suit in state court against the paramedics and

the police officers asserting violations of state law as well as violations of 42 U.S.C. § 1983.  On

December 18, 2006, the defendants removed the case to this court.  On March 5, 2008, the

plaintiffs filed an amended complaint.  The matter is currently before the court on the

defendants' motions for summary judgment and the supplemental briefing thereto.

4

## ANALYSIS

It is well established that "Government officials are generally entitled to qualified immunity when performing discretionary functions as long as the conduct `does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sandul v. Larion,* 119 F.3d 1250 (6th Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "In order to assert a violation of a `clearly established' right and defeat a qualified immunity defense, `the contours of the right must  be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id*. at 1254 (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987)).

The Sixth Circuit has adopted an objective reasonableness test to determine whether an officer would believe that a right is clearly established.  *Id.*  "The objective reasonableness test focuses on whether an official, given the facts that the official knew or reasonably should have known about the situation, should have known that his or her particular conduct would not pass scrutiny when applied to the law."  *Id*. (quoting *Long v. Norris*, 929 F.2d 1111 (6th Cir.), *cert. denied*, 502 U.S. 863 (1991)).

In analyzing a motion seeking to assert qualified immunity, the court must first determine if the plaintiffs' rights were violated at all, then, if so, whether it was clear to the officers that what they did violated plaintiffs' clearly established rights considering all the facts and circumstances.  *Hoover v. Radabaugh***,** 307 F.3d 460, 465 (6th Cir. 2002).

Here, it is clear that there is conflicting evidence concerning every aspect of the melee among the plaintiffs and defendants.  Therefore, because the plaintiffs have testified that they engaged in only the most proper and innocuous behavior throughout all the events, the court

5

holds that there is a genuine issue of material fact with regard to whether there was probable cause to arrest and prosecute the plaintiffs.  Thus, the court will presume that the plaintiffs have met the first element: that the conduct violated a constitutional right.

Nevertheless, the court concludes that the defendants are entitled to qualified immunity with respect to the federal claims.  Considering all the facts and circumstances known to the officials at the time of the incident, the court finds that it would not have been apparent to any of the defendants that their conduct violated plaintiffs' clearly established rights.  *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

With respect to paramedics Huss and Eberly-Hoshor, plaintiff Miller alleges that they violated her Fourteenth Amendment rights by asserting a false complaint against her with the police department and, thus, maliciously initiating prosecution against her.  However, there is no evidence that the paramedics requested that the plaintiffs be prosecuted.  In fact, it is important to note that at no time did the paramedics ask that the plaintiffs be arrested.  Instead, the paramedics were seeking assistance in securing the scene so that they could provide medical assistance to Ms. Brown without interference from Ms. Brown's family members.  Although the paramedics may have overreacted in calling the police, this action is not a violation of anyone's constitutional rights.   The law is well established that the defendants "cannot be held liable for malicious prosecution when [they] did not make the decision to prosecute [the plaintiffs]." *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005) (quoting *Skousen v. Brighton High School*, 305 F.3d. 520, 529 (6th Cir. 2002)); *Taylor v. Hart*, No. C-1-02-446, 2008 WL 906064, *3 (S.D. Ohio, March 31, 2008) (evidence defendant involved in decision to arrest or made up facts in order to have plaintiff arrested is not sufficient to support § 1983 claim for

malicious prosecution).  Accordingly, defendants' motion for summary judgment on plaintiffs' §

1983 claim for malicious prosecution against Huss and Eberly-Hoshor must be granted.

As to police officers Bell and Lemmon and firefighter Wright, the plaintiffs allege that

they violated their Fourth Amendment rights by detaining and arresting them without probable

cause.  The report the officers received at the scene, however, justified charging Miller for

"misconduct at an emergency," Ohio Rev. Code § 2917.13 and "obstructing official business,"

Ohio Rev. Code § 2921.31, and charging Abbey for "resisting arrest," Ohio Rev. Code §

2921.33.  *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (a determination of whether probable

cause existed requires examination of totality of circumstances and court to consider only the

information possessed by officer at the time of the arrest).

Specifically, at the time the officers arrested Miller, Officer Lemmon had just been told

by the attending paramedics that she was interfering with their efforts to treat a person in

distress.  The arrest report states:

> Officers were called to assist Clinton Township Medic 61 out of an incident at 2078
> Tanglewood Ct. Apt. B.  Upon arrival, Officer Lemmon came in contact with Tony
> Eberly and Todd Huss, the medics assigned to that medic.  Mr. Eberly and Mr. Huss
> stated that they were called on an injured person at that address and upon contact with
> her, she was found in the fetal position.  Mr. Eberly and Mr. Huss started to assess her
> condition.  During the assessment, Mr. Eberly and Mr. Huss asked the female, Imani D.
> O. Brown, questions about her pain(s).  Ms. Brown informed Mr. Eberly and Mr. Huss
> that she was having severe stomach pains, bleeding and that she had thrown-up.  Mr.
> Eberly and Mr. Huss asked Mr.[sic]  Brown to sit up on a couch.  When asked to do so,
> Akita Miller and Thyais Blocker, Ms. Browns [sic] sisters, started to scream at the
> medics.  Akita Miller screamed "I'm a medical student and you can lay down!" . . . Mr.
> Eberly and Mr. Huss continued to ask Ms. Brown questions to determine what steps they
> would need to take to help her.  With every question, Akita Miller interrupted and
> interjected her "medical oppinions [sic]." Mr. Huss and Mr. Eberly then informed both
> Akita Miller and Thyais Blocker that they needed to let them do their jobs and to stop
> interfering with the assessment of Ms. Brown.  Mr. Eberly and Mr. Huss stated that
> Thyais Blocker then accused them of "being rude" and told them to leave.  At the same
> time, Akita Miller stated that she was calling her husband.  Due to the interference from

7

Akita Miller and Thyais Blocker and now possibly Akita Millers [sic] husband arriving, Mr. Huss asked Mr. Eberly to call for police assistance. ..."

(Doc. 25, exhibit D)(all caps omitted).

Upon hearing the paramedics' account of events, Officer Lemmon decided to escort the paramedics back into the apartment so they could treat Brown.  Miller admits that, as Officer Lemmon was escorting the paramedics back inside the apartment, Blocker asked them "[w]hat's going on, where are you going?"  Although the parties disagree on the exact words Blocker used and her intent, the officers could reasonably infer from Miller's account of events that Blocker was attempting to stop the officials from entering the apartment.  Ms. Miller admits that she was only standing a few feet from Blocker at the time Blocker was questioning the officials' actions.  Thus, the officers could have reasonably believed that Miller was complicit in Blocker's attempt to interfere with the officials.

Furthermore, as Officer Lemmon was placing Blocker under arrest for misconduct at an emergency, Miller told the officer not to touch her sister.  Although Miller states that she was just trying to explain to Officer Lemmon that Blocker had a shunt in her arm and that he was hurting her, at the time of the incident, Officer Lemmon could have reasonably believed that by this conduct Miller was attempting to interfere with the arrest of Blocker.

The transcript of the 911 call demonstrates that the scene was chaotic.  Although, upon reflection it may appear that much of what occurred may have been avoided, the arresting agents are entitled to qualified immunity because they could reasonably have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time of the arrest, even though the belief may ultimately have been determined to be erroneous. *Id.* at 228-29 ("[t]he qualified immunity standard 'gives ample room for mistaken judgments,' by

8

protecting 'all but the plainly incompetent or those who knowingly violate the law.'").

In addition, there is no dispute that plaintiff Abbey engaged in a physical scuffle surrounding the arrest of his wife, plaintiff Miller.  Although some of the details of the scuffle are in dispute, there is no doubt in the mind of the court that it was not clear either to the police officers or defendant Wright that arresting Abbey would violate his Fourth Amendment rights. *Id.*  In fact, Wright made no arrest under federal law.  Instead, he merely pulled Abbey away from Officer Bell and held him until Officer Lemmon placed Abbey under arrest.  Therefore, all the defendants are entitled to qualified immunity on the federal claims.

 The court recognizes that the plaintiffs' claims under Ohio law involve different analyses than the claims analyzed in this opinion.  The court expresses no view on the Ohio claims, and remands those claims to the state court.  *See* 28 U.S.C. § 1367(c)(3).

Therefore, the court being sufficiently advised,

**IT IS ORDERED** that defendants' motions for summary judgment (Docs. #25, #27 and #59) be, and they are, hereby **granted as to plaintiffs' federal claims**, and plaintiffs' state claims be, and they are, hereby **remanded to the state court,** pursuant to 28 U.S.C. § 1367.  A separate Judgment shall enter concurrently herewith.

This 6th day of August, 2008.



Signed By:

**William O. Bertelsman** WOB

**United States District Judge**